577 So.2d 878 (1991)
Pamela W. FULLER
v.
PREFERRED RISK LIFE INSURANCE COMPANY.
PREFERRED RISK LIFE INSURANCE COMPANY
v.
Pamela W. FULLER.
89-1405, 89-1453.
Supreme Court of Alabama.
March 15, 1991.
*880 J. Knox Argo of Argo, Enslen, Holloway & Sabel, Montgomery, for appellant/ cross-appellee.
Ollie L. Blan, Jr. of Spain, Gillon, Grooms, Blan & Nettles, Birmingham, and William P. Sawyer of Weiss & Sawyer, Montgomery, for appellee/cross-appellant.
PER CURIAM.
Pamela W. Fuller sued for damages for breach of contract and fraud when Preferred Risk Life Insurance Company refused to pay certain claims made on her health and hospitalization policy, claiming the right of coordination of benefits (payment only of what other carriers do not pay). The jury found in her favor and in favor of the agent, but against Preferred Risk, and fixed punitive damages at $1 million. This award was reduced by the trial judge to $250,000 on the grounds that the plaintiff could not recover more than she had asked for in the complaint. The plaintiff appeals.
Preferred Risk cross appeals, claiming that because its agent was exonerated by the jury it can not be found guilty of fraud and that the punitive damages award can not stand.
Ms. Fuller bought an individual health and hospitalization insurance policy from Mike Holyfield, an agent of Preferred Risk Life Insurance Company, in April 1984. She states that Holyfield showed her a brochure prepared by Preferred Risk. She contends that when Holyfield sold her the policy, he represented to her that her policy was a major medical policy with a provision for a one-time deductible of $500 and that this policy would pay up to a limit of $25,000 regardless of whether she had other insurance. She contends that neither the agent nor the company ever told her that the policy contained a coordination of benefits provision.
*881 Ms. Fuller married in May 1984 and became eligible for benefits under her new husband's health insurance policy. After her marriage, she returned to see agent Holyfield to have her name changed on the insurance policy. Ms. Fuller told Holyfield that she now had other insurance through her husband's employer. Holyfield again told her that the policy would pay medical expenses also paid by her husband's employer's insurance and urged her to keep the Preferred Risk policy. Later, the plaintiff and her husband, Felix Fuller, went to see Holyfield. Felix Fuller testified that Holyfield told them that the policy had a provision for a $500 deductible and would pay in addition to benefits received from his employer's insurance.
In 1985, the plaintiff had surgery and incurred substantial medical expenses. She made a claim under both her Preferred Risk policy and the Transamerica/Provident Life Insurance Company policy insuring her husband. Neither would pay. She then employed an attorney, and her claim against Preferred Risk was ultimately settled. The plaintiff testified that no one representing her explained why Preferred Risk disputed her claim. The plaintiff contends that neither she nor her attorneys in this case were aware of any coordination of benefits provision in the Preferred Risk policy. She kept the policy and paid the premiums by a monthly draft on her bank account.
Subsequently, on April 4, 1986, the plaintiff was involved in an automobile accident and sustained substantial injuries. She submitted another claim to Preferred Risk. Her husband's policy with Transamerica/Provident Life paid $14,569, and her automobile policy with State Farm Mutual paid $10,000. These amounts combined exceeded her medical bills of $24,133.89. Preferred Risk refused to pay any benefits, claiming the right of coordination of benefits.
Ms. Fuller filed suit against Preferred Risk, alleging breach of contract and fraud. Her complaint sought "judgment against defendants for $250,000 in compensatory and punitive damages, plus costs."
The jury returned a verdict against Preferred Risk in the amount of $16,764.82 on the contract count, $1 in compensatory damages, and punitive damages of $1 million.
Preferred Risk filed a motion for judgment notwithstanding the verdict or for a new trial or remittitur. After a hearing on June 5, 1990, the trial judge issued an order that reduced the verdict to $250,000. His order stated in part:
"The Court is of the opinion that the judgments awarded to Plaintiff in the amount of $1,016,765.82 are in excess of the amount claimed by Plaintiff in the complaint, and Plaintiff failed to comply with Rule 15, A.R.Civ.P. by filing an amendment to the ad damnum clause."
We first consider the issues presented by Preferred Risk's cross appeal. Preferred Risk argues that the jury's verdicts for the agent and against the insurance company are inconsistent. Preferred Risk cites us to American Southern Ins. Co. v. Dime Taxi Service, Inc., 275 Ala. 51, 53, 151 So.2d 783, 785 (1963), wherein we said:
"Our cases establish the rule that where a defendant is held liable only because he is responsible for the act of another, he cannot be held liable if such other is exonerated. Great A & P Tea Co. v. Traylor, 239 Ala. 497, 195 So. 724; Griffin v. Bozeman, 234 Ala. 136, 173 So. 857; Waters v. Anthony, 252 Ala. 244, 40 So.2d 316. And where the master and servant are sued jointly, a judgment against the master absolving the servant of liability for tort committed by the servant is inconsistent and must be set aside. Carter v. Franklin, 234 Ala. 116, 173 So. 861; Sibley v. Odum, 257 Ala. 292, 58 So.2d 896 [1951]."
275 Ala. at 53, 151 So.2d at 785.
Preferred Risk contends that its liability for fraud and punitive damages is based solely upon the application of the doctrine of respondeat superior. The record does not support this contention. The plaintiff claimed at trial that one source of Preferred Risk's liability could be the actions of its agent. However, the plaintiff also contended that Preferred Risk's liability *882 was direct and derived from its own actions without regard to the actions of its agent.
The plaintiff presented to the jury evidence that reflected that she bought a health insurance policy that she was told was a standard major medical policy with a $500 deductible. Mike Holyfield, the agent who sold her the policy, testified that he sold the policy using the page in the sales brochure that stated that the policy had a "one-time deductible of $500" and that illustrated this statement with a listing of medical expenses less than $500. The application form also says "$500 deductible."
The testimony reflects that the Preferred Risk agents who were to sell this policy, such as Mike Holyfield, were given very little training. They were not given a manual describing the policy. Their only training consisted of reading a book and filling out some answers. There was no follow-up with the agents to tell them the correct answers to the questions. Nothing on the test mentioned the coordination of benefits, or the floating deductible. Mike Holyfield admitted that it was not until this lawsuit was filed that he learned that the representation regarding the $500 deductible was false, and that he did not learn until the trial itself that the representation regarding the one-time deductible was false.
The Preferred Risk policy did not use the term "coordination of benefits," but did nevertheless provide for a coordination of benefits. The operative language was not in the section of the policy listing what "we will not pay for," as one would anticipate. Under the "Benefits Provision," the policy defines the deductible as "the amount of other coverage you have." "Other coverage" is then defined as "another insurance policy ... which pays for medical expenses incurred." The benefit period is not defined in the policy.
During the trial, the two Preferred Risk employees who testified, and who have the responsibility for interpreting the policy, had trouble locating provisions in the policy. Ms. Tiernan, Preferred Risk's representative, admitted in her testimony that the application form said that the policy had a $500 deductible provision, but that the policy itself had a floating deductible.
The plaintiff presented testimony from personnel of the Alabama Department of Insurance that the Department had for many years had a regulation prohibiting coordination of benefits in individual policies. Neal Moseley, who had worked for the Department of Insurance since 1981, testified that, to his knowledge, the Department had not permitted coordination of benefits provisions in individual contracts since 1981, which predated this policy. He further testified: "The regulations do not permit it; however, statutory law does permit it." Tharp Forrestor, former commissioner of insurance, testified that in April 1980, when the Preferred Life policy was approved, the Department of Insurance had a regulation prohibiting coordination of benefits in individual policies. Preferred Risk did not object to or challenge the testimony as to this regulation.[1]
Ms. Fuller's attorney informed Preferred Risk by letter, on August 12, 1987, that the Insurance Department had informed him that it was illegal to coordinate benefits in an individual policy in Alabama. During the trial of the case, Preferred Risk admitted that it had contacted the Department and had been told about this regulation. However, Preferred Risk did not pay any benefits pursuant to the policy.
Preferred Risk claimed at the trial that it had disclosed the coordination of benefits provision to Ms. Fuller through her attorneys at the time she filed a claim for her 1985 injuries. Her attorneys at that time testified, but their testimony did not support this contention.
Thus, the finding that Preferred Risk had committed a fraud and the assessment of punitive damages could have been based upon the testimony concerning Preferred *883 Risk's deceptive brochures, materials, and policy and upon its failure to inform the plaintiff of the coordination of benefits provision and the true coverage of her policy. This Court will assume that the jury's verdict in favor of the agent and against Preferred Risk was based on a finding that the fraud was due to the actions of Preferred Risk alone.
The verdict forms submitted to the jury, with the agreement of Preferred Risk, are proof that all involved in the trial understood the basis of liability. On the fraud issue, the trial court submitted one verdict form for a verdict in favor of the plaintiff and against both defendants, and one form against Preferred Risk only. The trial judge charged the jury in regard to the two possible forms. The verdict as to the fraud claim against Preferred Risk is not inconsistent.
Preferred Risk also seeks to have this Court review the question of the plaintiff's justifiable reliance in this fraud case. The trial court properly submitted this factual issue to the jury, which rejected Preferred Risk's argument that Ms. Fuller had not "justifiably relied" on the misrepresentations. This issue was also raised by Preferred Risk's motion for a new trial, and it was rejected by the trial court. The jury verdict as to this issue was supported by the evidence. Liberty Nat'l Life Ins. Co. v. Sherrill, 551 So.2d 272 (Ala.1989).
Preferred Risk contends that the recovery in this case is limited to $250,000, citing us to Alabama Code 1975, § 6-11-20 (the punitive damages cap). However, § 6-11-20 provides specifically that the cap on punitive damages does not apply to a plaintiff whose cause of action accrued prior to the date the act became effective  June 11, 1987. Ms. Fuller's cause of action accrued prior to that date; therefore, her recovery is not limited by this cap.
Preferred Risk cites this Court to Ex parte Huntsville Hospital, 540 So.2d 1344 (Ala.1988), claiming that that case holds that the tort reform acts do apply to causes of action that accrued before the effective date of the acts. This is incorrect. Huntsville Hospital dealt only with the issue of venue and the question of which of the two tort reform statutes on venue  the forum non conveniens statute or the medical malpractice statute  governed in determining the venue rule to be applied to that medical malpractice case. The case refutes Preferred Risk's contention that the tort reform acts all have the same starting dates.
Preferred Risk also complains that the imposition of punitive damages violates due process. Because Preferred Risk failed to offer a proper objection, or to obtain a ruling from which an appeal could be taken, it can not complain now. Rule 51, A.R.Civ.P., Olympia Spa v. Johnson, 547 So.2d 80, 86 (Ala.1989).
Finally, we consider the question raised by the plaintiff on her appeal, i.e., whether the trial court erred in reducing the award of punitive damages to the amount claimed in the complaint.
The trial judge's order contemplates that an amendment to the ad damnum clause was required under Rule 15, A.R. Civ.P. The plaintiff did so amend, after the verdict, without objection by Preferred Risk, and without any adverse ruling by the trial court in regard to the amendment. However, it was not necessary that she amend. Rule 15(b) provides that amendments "may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."
The adoption of the Alabama Rules of Civil Procedure in July 1973 ensured that the relief available to a plaintiff was not limited by the pleadings filed by his attorney. Rule 54(c), A.R.Civ.P., Awad v. Awad, 54 Ala.App. 154, 306 So.2d 21 (1975). This Court has held that in a litigated case the amount claimed does not necessarily limit the amount of recoverable damages. Suter v. Arrowhead Investment Co., Ltd., 387 So.2d 815 (Ala.1980). See also Madison Highlands Development Co. v. Dean & Son Plumbing Co., 415 So.2d 1129 (Ala. Civ.App.1982).
Rule 54(c), A.R.Civ.P., provides that every final judgment shall grant the relief to *884 which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings. Federal Rule 54(c), on which our rule is modeled, has been interpreted to allow judgments in excess of the amount requested in the pleadings. Couto v. United Fruit Co., 203 F.2d 456 (2d Cir.1953); Neff v. Western Cooperative Hatcheries, 241 F.2d 357 (10th Cir.1957); Brown v. Burr-Brown Research Corp., 378 F.2d 822 (5th Cir.1967); Stewart v. Banks, 397 F.2d 798 (5th Cir.1968), cert. dismissed, Sims v. Banks, 393 U.S. 801, 89 S.Ct. 41, 21 L.Ed.2d 85 (1968); Steinmetz v. Bradbury Co., 618 F.2d 21 (8th Cir.1980).
The trial judge erred in reducing the jury verdict to the amount claimed in the complaint. His order makes it clear that the reason he did so was because of his misunderstanding of the law.
Punitive damages awards have come under increasingly intense debate in legal, academic, and political circles in recent times. The debate is not over. Some contend that the facts do not support the charge that such awards are becoming routine. See Morris, "Inquiry Needed on Punitive Damages", Nat.L.J., June 9, 1986, at 15, col. 1. A study conducted by the American Bar Foundation concluded that punitive damages awards "are not routine" and are "not typically in an amount that boggles the mind." Daniels, "Punitive Damages: The Real Story", 72 A.B.A.J. 60, August 1986. But, even so, awards in increasingly large amounts, albeit in relatively few cases, are a cause for concern and invite reconsideration of the role of the trial judge in reviewing them. Prentice, "Reforming Punitive Damages: The Judicial Bargaining Concept," 7 Rev.Lit. 113 (1988).
Once a jury is demanded by either party, the jury has the constitutional authority to determine what amount, if any, of punitive damages is necessary to punish a defendant for wrongful conduct and to deter future conduct of a like nature. The common law assigned this function to the jury. Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886). That authority is not diminished by post-verdict review of the verdict by the trial court. Trial courts were assigned that function at common law.
When a party files a post-verdict motion challenging the validity of a jury verdict, the trial court must determine whether the movant is entitled to a new trial or to a judgment notwithstanding the jury verdict, depending upon the facts of the case and the grounds of the post-verdict motion. If the trial judge finds that the motion for new trial or JNOV is well taken, then he must either grant the movant a new trial or render a judgment notwithstanding the verdict. He may not, if the movant is entitled to a new trial or JNOV, reduce the verdict as a substitute for a new trial or JNOV. The movant is entitled to a new trial if the verdict was not rendered by a properly functioning jury whose verdict is based on the evidence and the law as charged by the court.
If, however, the trial court finds that the movant is not entitled to a new trial or JNOV, and if the movant alleges that the verdict exceeds an amount necessary to accomplish the purpose for which punitive damages are allowed in the first instance and excessively punishes him beyond the limits allowed by due process, he is entitled to a hearing on this ground.
A jury, in reaching an amount to be returned in a punitive damages case, must necessarily focus on the defendant, because the plaintiff's loss is not to be compensated by a punitive damages award. The jury must determine the amount it considers necessary to vindicate the public interest by eliminating the reprehensible conduct of the defendant and to punish the defendant appropriately. See Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989) (factor # 1, at 223).
A trial judge, in reviewing a punitive damages award by a jury, must likewise consider the effect of the verdict on the defendant's financial condition and determine whether the amount of the verdict is so great that it amounts to a deprivation of the defendant's property without due process of law. In addition to this *885 historical role, which the judiciary has played since ancient times and which is embodied in our constitution by its adoption of the common law, § 13 of Ala. Constitution 1901 empowers the trial court to conduct, and compels judicial review of a punitive damages award once a defendant challenges the verdict on the ground that it deprives him of his property in contravention of the constitution. As we have stated so many times, the punitive verdict should be enough to punish the defendant and vindicate the public's right to be free of the kind of conduct of which the jury has found the defendant guilty, but the amount should not be so much as would financially destroy him. A defendant has the right to a judicial determination and the courts have the responsibility to determine whether a jury verdict awarding punitive damages deprives the defendant of his property in violation of the due process protections that § 13 of the constitution guarantees him. In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), we attempted to set forth some of the factors that the trial courts could consider in passing on the claim that a jury verdict was excessive. We stated that a verdict rendered by a jury that was properly constituted and that had functioned properly was endowed with a constitutional protection that prohibited a judge from interfering with it. We recognized, however, that once the defendant showed that the amount of the verdict was excessive and therefore deprived him of his property in contravention of constitutional protections, then the courts were free, indeed were compelled, to reduce it. Section 13 protects the rights of all, and while a trial by jury is guaranteed by § 11 of our constitution, § 13 ensures that no person may be deprived of his property without due process of law. For this reason, a defendant who charges that a jury verdict exceeds the amount that a jury may properly assess to vindicate the public and punish the defendant to deter him and others from similar conduct, is entitled to a hearing before an impartial court for a determination of that claim. Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). The judge, like the jury, must determine whether the award is excessive by focusing on the defendant, not on the plaintiff. This is true for two reasons: first, the plaintiff is not entitled to an award of punitive damages; second, the defendant may not be punished to such an extent that he is deprived of his rights. The focus of the post-verdict hearing required by Hammond, supra, and Green Oil Co., supra, is to determine whether the verdict is so large that it goes beyond an amount necessary to vindicate the public and to punish the defendant. If it does, it violates the defendant's right guaranteed and protected by § 13. If the trial court determines that it does, the defendant is entitled to have the verdict reduced. If the trial court determines that the verdict is not so large as to violate the defendant's rights under the constitution, it must enter judgment on the verdict as returned by the jury.
In this case, the trial judge failed to make the findings required by Hammond v. City of Gadsden, supra, and Green Oil Co. v. Hornsby, supra. Does this require a remand as argued by Preferred Risk? We hold that it does not in the posture of this case. When the jury returned its verdict, Preferred Risk filed its motion for a new trial, a judgment notwithstanding the verdict, or a remittitur. Preferred Risk argued only that, because the verdict exceeded the amount claimed in the complaint, it was due to be reduced. It did not offer any evidence in support of its contention that the verdict was excessive, and instead argued that it was entitled to a reduction of the verdict as a matter of law.
Even after the plaintiff offered evidence in support of her contention that the verdict was not excessive,[2] Preferred Risk declined to produce any evidence to the contrary. Preferred Risk responded to the plaintiff's post-verdict interrogatories by stating that the jury verdict "would not significantly impair their ability to operate." Thus, it makes no claim that the *886 verdict deprives it of its property without due process of law under § 13.
This Court observed in Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1988), as follows:
"Nothing prevents the defendant, at a hearing on a motion for new trial based on an allegedly flawed jury verdict, from presenting evidence to prove one or more of the above considerations [Hammond factors], and, by doing so, to guarantee that his right to due process of law in regard to the jury's award is protected. In sum, `fundamental fairness' requires that the defendant be given the opportunity to present proof to the trial court during post-judgment review of the verdict that the punitive award is unreasonable, disproportionate, or economically destructive...."
547 So.2d at 838-39. Preferred Risk had this opportunity and elected to present no evidence at all.
In Hammond v. City of Gadsden, supra, this Court held:
"[O]nly where the record establishes that the award is excessive or inadequate as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive may a trial court order a new trial or remittitur."
493 So.2d at 1379. The trial judge erroneously reduced the verdict because of his misunderstanding of the applicable law. The record is devoid of any evidence that would justify interference with the verdict under the criteria established in Hammond, Green Oil Co., and their progeny.
Accordingly, the judgment of the trial court is reversed insofar as it reduced the amount of the verdict; otherwise it is affirmed; and the cause is remanded with instructions to the trial court to enter a judgment on the jury's verdict.
89-1405 REVERSED AND REMANDED WITH INSTRUCTIONS.
89-1453 AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS, KENNEDY and INGRAM, JJ., concur.
MADDOX, J., concurs in the result.
HOUSTON and STEAGALL, JJ., concur in the result of the per curiam opinion and join Justice SHORES's special concurrence.
SHORES, HOUSTON and STEAGALL, JJ. concur specially.
SHORES, Justice (concurring specially).
I believe that much of the criticism surrounding the issue of punitive damages is due to the perception on the part of the public that punitive damages awards sometimes amount to an undeserved windfall to the prevailing plaintiff. I believe it is true that sometimes an award does constitute an undeserved windfall to the plaintiff, but this fact has no bearing on the question of whether the award exceeds an amount appropriate to punish the defendant for the wrong committed and to deter others from similar conduct in the future. These are the factors the trial court is required to consider on the defendant's claim that the verdict is large. If the court concludes that the amount is not so excessive as to deprive the defendant of his property in contravention of § 13, Ala. Constitution 1901, it nevertheless may also determine that it would be in the best interest of justice to require the plaintiff to accept less than all of the amount and to require the defendant to devote a part of the amount to such purposes as the court may determine would best serve the goals for which punitive damages are allowed in the first place: vindication of the public and deterrence to the defendant and to others who might commit similar wrongs in the future. In such cases, the court has the discretion to order the defendant to devote a portion or all of the amount to efforts to eliminate the conditions that caused the plaintiff's injury.[3]
*887 In my opinion, the court may also order the defendant to pay part of the award either to the state general fund or to some special fund that serves a public purpose or advances the cause of justice. In Florida, for example, by statute 60 percent of each punitive damages award goes to either the Public Medical Assistance Trust Fund or to the General Revenue Fund, depending upon the type of case.[4] A Colorado statute requires that one-third of each punitive damages award be paid into the state general fund.[5] Illinois statutory law gives the trial judge discretion to allocate the punitive damages award among the plaintiff, the plaintiff's attorney, and the Department of Rehabilitation.[6] An Iowa statute requires that 75 percent of each punitive damages award be paid to the state unless the defendant acted with specific intent to injure the plaintiff.[7] A Georgia statute required that 75 percent of all punitive damages awarded in products liability cases be paid to the state;[8] however, this Georgia statute has been ruled unconstitutional.[9]
The states just referred to allocate punitive damages pursuant to statute. The courts, however, have inherent authority to allocate punitive damages, with jurisdiction over both plaintiff and defendant, by reducing the amount that the plaintiff is to receive to less than the full amount of the verdict, and directing the defendant to pay a part of a punitive damages award to the state general fund or any special fund devoted to the furtherance of justice on behalf of all the people. To do so in proper cases could serve the purpose for which punitive damages were authorized to a greater degree than would allowing the plaintiff to receive the entire amount. Because the plaintiff's action resulted in the award, the beneficiary of which is the general public, it follows that the plaintiff's attorney fees should be based upon the total verdict, and not the reduced amount paid to the plaintiff, since it is due to the attorney's efforts that the public interest has been served.
If the award is not reduced, of course, the plaintiff's attorney is entitled to an attorney fee based upon the original verdict as returned by the jury. Only if the verdict is reduced by an amount necessary to preserve the defendant's due process rights is the plaintiff's attorney fee to be determined based upon the reduced amount, that is, the amount necessary to serve the goals sought to be served by authorizing punitive verdicts, without offending the defendant's constitutional rights.
HOUSTON and STEAGALL, JJ., concur.
NOTES
[1] Preferred Risk moves this Court for leave to file a motion under Rule 60(b)(3) and (6), A.R. Civ.P., on the grounds that the trial court and jury were misled by the testimony of the two employees. We deny this motion, because Preferred Risk made no objection to this testimony at the time of the trial.
[2] The plaintiff offered Preferred Risk's annual report, which showed a total net income for the last five years of $26 million and an unassigned surplus of $39.5 million.
[3] See O'Gilvie v. International Playtex, Inc., 609 F.Supp. 817 (D.Kan.1985), and Miller v. Cudahy Co., 592 F.Supp. 976 (D.Kan.1984).
[4] Fla.Stat.Ann. § 768.73(2) (West Supp.1987).
[5] Colo.Rev.Stat. § 13-21-102(4) (1987).
[6] Ill.Rev.Stat. Ch. 110, para. 2-1207 (Supp.1987).
[7] Iowa Code Ann. § 668.1(2)(b) (West Supp. 1987).
[8] Ga.Code Ann. § 51-12-5.1(e)(2) (Supp.1987).
[9] Our research reveals that the constitutionality of these statutes has been tested in only one jurisdiction, Georgia. McBride v. General Motors Corp., 737 F.Supp. 1563 (M.D. Ga.1990), held Georgia's statute to be unconstitutional, as a violation of Georgia's due process and equal protection provisions, as well as the excessive fines provision of the Georgia and Federal Constitutions.